**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LUIS COMACHO CORREA,** | |
| **Plaintiff,** | **Case No. 21-cv-01367** |
| **v.** | |
| **OTTO ENGINEERING INC.,** | **Judge Jorge L. Alonso** |
| **Defendant.** | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Otto Engineering Inc. ("Defendant") has moved for summary judgment on plaintiff Luis Comacho Correa's ("Plaintiff") discriminatory discharge claim, the sole remaining claim in this suit. Plaintiff asserts that Defendant violated the Americans with Disabilities Act ("ADA") by suspending and then terminating his employment because of his attention deficit disorder ("ADD"). Defendant also moves to strike portions of Plaintiff's declaration and responses to Defendant's asserted facts. For the reasons that follow, Defendant's motion for summary judgment is denied in part. Summary judgment is granted in part in Defendant's favor with respect only to Plaintiff's claim for severance pay and health insurance damages. Defendant's motion to strike is denied.

## I.    MOTION TO STRIKE[1]

The Court first addresses Defendant's motion to strike portions of Plaintiff's declaration and responses to DSOMF and to deem portions of DSOMF admitted. (ECF No. 60.) Defendant's motion is fully briefed, and the Court previously granted Plaintiff leave to file amended responses to DSOMF. (ECF No. 67.)[2]

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment and states that motions to strike are disfavored. The Court enforces Local Rule 56.1 strictly.  *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; he or it must put forth evidence.  Fed. R. Civ. P. 56(c)(1)(A); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted.  *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs.,*

---

[1] Defendant's Local Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment (ECF No. 50) shall be referred to herein as "DSOMF," while Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts in Opposition of Defendant's Motion for Summary Judgment (ECF No. 55-1) shall be cited to herein as "PSOMF."

[2] Plaintiff's amended responses shall be referred to herein as "Pl. Am. Resp. to DSOMF." (ECF No. 71.) Defendant's responses to PSOMF shall be referred to herein as "Def. Resp. to PSOMF." (ECF No. 58.)

*Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

The Court considers the parties' arguments respecting Plaintiff's declaration and amended responses to DSOMF, as well as Defendant's objections to PSOMF, in conjunction with its analysis of Defendant's motion for summary judgment. In accordance with the law set forth above, to the extent Plaintiff fails to properly dispute any of Defendant's asserted facts, the Court deems those facts admitted. Where any such facts are material to the Court's analysis, the Court notes them within this Opinion. Furthermore, the Court will not consider Plaintiff's asserted facts that are not supported by deposition testimony, documents, affidavits, or other evidence admissible for summary judgment purposes.

Because the Court considers Defendant's arguments in the context of its summary judgment motion, and because motions to strike are disfavored, Defendant's motion to strike is denied.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  BACKGROUND[3]

Defendant is a "manufacturer of high demanding applications and plastics, such as components that control airplanes, construction equipment, and other machines." (DSOMF ¶ 1.) Defendant's attendance policy requires employees to not only come to work every day on-time, but to be at their workstation at their designated start time. (*Id*. ¶¶ 2-3.) If an employee is unable to come to work, or expects to be late, the employee must contact the employee's supervisor,

---

[3] The facts set forth in the "Background" section are undisputed by the parties unless otherwise noted.

manager, or the Human Resources Department ("HR") within one hour of the employee's start time. (*Id*. ¶ 2.) Employee punctuality is important to Defendant because the departments plan their days by the number of staff they have, and if a molding press is not active, the company cannot produce as much product. (*Id*. ¶ 4.)

Plaintiff began working for Defendant in 2001 as a "molding technician." (*Id*. ¶ 7.) Plaintiff reported to Larry Follman, the "Molding Supervisor," and worked on the first shift, which started at 7:00 a.m. (*Id*. ¶¶ 5 and 10.) Plaintiff nonetheless arrived to work after 7:00 a.m. more frequently than his coworkers. (*Id*. ¶ 21.) "Reliable attendance" was listed as a job specification for the molding technician job description, (*id*. ¶ 8), although Plaintiff received ratings of "exceptional" or "competent" on his annual performance reviews between 2013 and 2017 with no mention of tardiness. (Pf. Resp. Mem. Ex. C at OTTO_000027-28, ECF No. 55-3.)

Plaintiff, like other molding employees, was an hourly employee and was required to keep track of his work by writing his exact start and stop time onto a paper timesheet that was posted on the wall of the molding department, so that Mr. Follman could then enter the start and stop times into ADP, the company's payroll software. (DSOMF ¶ 11.)[4] It is undisputed that at least prior to March 7, 2019, unless otherwise approved, employees were expected to put their actual time on the timesheet; for example, if an employee was five minutes late, he or she was expected to write 7:05 on the timesheet. (*Id*. ¶ 12.)[5] It is also undisputed that at least prior to

---

[4] Plaintiff denies that molding department employees were required to put their actual start time on the timesheet. (Pl. Am. Resp. to DSOMF ¶ 11.) Plaintiff cites only to his own deposition testimony responding "Yes" to the question: "Were you supposed to put in both the beginning – both your start and stop time?" (*Id*. (citing Pl. Resp. Mem. Ex. E at 64:22-24, ECF No. 55-3).) Because Plaintiff's cited evidentiary material does not controvert Defendant's asserted fact, DSOMF paragraph 11 is deemed admitted.

[5] Plaintiff denies only that he was required to write his actual start time after March 7, 2019. (Pl. Am. Resp. to DSOMF ¶ 12.)

March 7, 2019, Plaintiff developed a habit of showing up after 7:00 a.m., but indicating on his timesheets that he had arrived on time, and then lying about his arrival time when confronted by supervisors. (*Id*. ¶ 13.)[6]

Plaintiff was diagnosed with attention deficit disorder ("ADD") in 2007 and has been seeing Dr. Herman Langner, a psychiatrist, monthly since then. (*Id*. ¶¶ 3 and 65.) While it is undisputed that Plaintiff has "issues with the concept of time" and has trouble remembering dates (*id*. ¶ 66), the parties dispute whether Plaintiff told Mr. Follman about his ADD in 2016 and that because of his ADD, Plaintiff had trouble keeping track of time which caused him to be late often. (*Id*. ¶ 70; PSOMF ¶ 4.) It is also disputed whether Plaintiff asked Mr. Follman for help, whether Mr. Follman allowed Plaintiff a flexible work schedule provided Plaintiff worked eight hours during his shift, and whether Plaintiff was embarrassed and did not want anyone else to know that he had ADD. (PSOMF ¶ 5.) Prior to that time, in 2015, Plaintiff signed a voluntary self-disclosure form indicating "NO, I DON'T HAVE A DISABILITY." (DSOMF ¶ 65.)

Plaintiff admits that between 2016 and 2019, he came to work late between 10-25 times and was "often tardy." (*Id*. ¶ 14.)[7] Plaintiff's coworkers repeatedly complained to management

---

[6] Plaintiff appears to take issue with Defendant's use of the term "late" based on his alleged accommodation of a flexible work schedule due to ADD (Pl. Am. Resp. to DSOMF ¶ 13), but it is nonetheless undisputed that Plaintiff often arrived to work after 7:00 a.m. Plaintiff also states that Mr. Follman entered Plaintiff's start and stop times on the molding department's timesheet, citing Plaintiff's testimony in support. Plaintiff makes this same response to a number of Defendant's asserted facts. While there is apparently a dispute as to who entered such information on Plaintiff's timesheets after March 7, 2019, at no point in Plaintiff's responses to DSOMF does he point to any evidence controverting Defendant's assertion that Plaintiff entered the information on his timesheets prior to March 7, 2019. Finally, Plaintiff does not support with any citation to evidence his denial of Defendant's statement that Plaintiff lied about his arrival time when confronted by supervisors. Accordingly, DSOMF paragraph 13 is deemed admitted in these respects.

[7] Plaintiff appears to take issue with Defendant's use of the term "tardy," basing his denial solely on citation to his own deposition testimony that he had an accommodation of a flexible work

about Plaintiff arriving to work late. (*Id*. ¶ 18.)[8] However, Plaintiff did not encounter any problems until 2019 when he began to accumulate points as part of Defendant's progressive discipline system. (PSOMF ¶ 11.) Plaintiff's tardiness was interfering with the molding department's production because he was not present to go over what had transpired during the evening shift and what needed to be produced for the day. (DSOMF ¶ 17.)[9] Plaintiff further failed to call Mr. Follman in advance on days he was late, unlike other employees. (*Id*. ¶ 15.)[10] In particular, Plaintiff's molding technician coworkers Chaney Duron, Jose Martinez, and Bill Ferguson were at least sometimes late to work. (*Id*. ¶ 71; PSOMF ¶ 25.) Mr. Martinez told Plaintiff that he had dyslexia, although it is unknown whether Mr. Duron or Mr. Ferguson had any disabilities. (DSOMF ¶ 71; PSOMF ¶ 10.)

Because Plaintiff was showing up late for his shift but writing down a 7:00 a.m. start time on his timesheet, Jerry Skowronski, Defendant's "Facilities Manager," pulled footage from the company's security cameras and confirmed that Plaintiff arrived later than the times he had

---

schedule due to ADD. (Pl. Am. Resp. to DSOMF ¶ 14.) The Court finds that this is improper legal argument, particularly considering Plaintiff admitted he was "often tardy" in the operative complaint. (Am. Compl. ¶ 11, ECF No. 47.) Accordingly, DSOMF paragraph 14 is deemed admitted in this respect.

[8] Although Plaintiff denies that other employees complained to Mr. Follman about him based on his own declaration (Pl. Am. Resp. to DSOMF ¶ 18 (citing Pl. Resp. Mem. Ex. B ¶ 15, ECF No. 55-3)), Plaintiff lacks personal knowledge of those communications and therefore Plaintiff's denial is not considered. *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

[9] Because Plaintiff fails to support his denial with evidentiary citations (Pl. Am. Resp. to DSOMF ¶ 17), it is not considered and DSOMF paragraph 17 is deemed admitted.

[10] Although Plaintiff denies that other employees called Mr. Follman in advance if they were going to be late based on his own declaration (Pl. Am. Resp. to DSOMF ¶ 15 (citing Pl. Resp. Mem. Ex. B ¶ 14, ECF No. 55-3)), Plaintiff lacks personal knowledge of those communications and therefore Plaintiff's denial is not considered. *Visser*, 924 F.2d at 659.

written on the timesheet. (DSOMF ¶ 22.)[11] On March 7, 2019, Dan Pigott (Defendant's "Plant Manager"), Barbara Schmidt (Defendant's "HR Director"), Len Szatkowski (Defendant's "Production Manager"), and Mr. Follman met with Plaintiff to discuss his tardiness and his failure to write his accurate starting times on the timesheets. (*Id*. ¶ 28.)[12]

Plaintiff understood Defendant's expectations of timeliness and attendance and knew that falsifying company records was against Defendant's rules and could be cause for dismissal. (*Id*. ¶¶ 6, 9 and 29.) It is disputed whether during the March 7, 2019, meeting, Plaintiff told the group he had been diagnosed with ADD. (*Id*. ¶ 30.) There is no dispute that Mr. Szatkowski, Ms. Schmidt, and Mr. Pigott did not know about Plaintiff's ADD before that day, and that Ms. Schmidt gave Plaintiff a writeup that had been prepared in advance of the meeting with still-frame photos from the security footage. (*Id*. ¶¶ 31 and 34.) During the meeting, Plaintiff pulled out a prescription for Adderall and handed it to Ms. Schmidt. (*Id*. ¶ 32.) At the time, Ms. Schmidt did not know what Adderall was for. (*Id*. ¶ 33.) The parties dispute whether Plaintiff then told the group that Mr. Follman knew of his ADD and granted him an accommodation of a flexible work schedule. (PSOMF ¶ 13.)

---

[11] Because Plaintiff fails to support his partial denial with evidentiary citations (Pl. Am. Resp. to DSOMF ¶ 22), it is not considered and DSOMF paragraph 22 is deemed admitted.

[12] Plaintiff admits the meeting occurred but denies falsifying his time records. (Pl. Am. Resp. to DSOMF ¶ 28.) However, his evidentiary citations do not support his denial. His cited testimony and declaration state only that: (1) he never saw nor created certain ADP records, dated both prior to and after the March 7, 2019 meeting, before they went to HR for processing; (2) the handwritten timesheet for the week of October 14-18, 2019 was neither written nor signed by him; and (3) after the March 7, 2019 meeting, Mr. Follman told Plaintiff not to write his time in on the timesheets. None of this evidence controverts that Plaintiff received a warning on March 7, 2019, for tardiness and falsification of timesheets prior to that time. Accordingly, Plaintiff's denial in this respect is not considered and DSOMF paragraph 28 is deemed admitted.

Plaintiff was suspended for three days and told that he had to check in at 7:00 a.m. daily with Mr. Follman or Mr. Szatkowski, and Plaintiff understood this mandate. (DSOMF ¶ 37.) The write-up was signed by someone with the title "Molding Supervisor," and the "Company Statement" section of the write-up states: "Lou has been caught several times coming in late then falsifying his time sheet. This has been discussed With [sic] Lou several times with me & Len Szatkowski." (DSOMF Ex. N at OTTO_0004118, ECF No. 50-1.) It is disputed that after the meeting concluded, Ms. Schmidt told Plaintiff about a special clock with colored numbers and lights that would help him keep track of time, that Mr. Follman told Plaintiff that going forward Mr. Follman would enter Plaintiff's time for him, and that thereafter Plaintiff stopped signing the timesheet. (PSOMF ¶¶ 16, 19 and 21.)

Plaintiff admits that after the March 7, 2019 warning, he continued to show up late and did not always check in with management at 7:00 a.m. (*Id*. ¶ 40.)[13] It is disputed whether Mr. Pigott told Plaintiff at a company picnic that he did not care if "you guys" are five or ten minutes late. (PSOMF ¶ 27.)[14] On April 1, 2019, Mr. Szatkowski noticed that Plaintiff was not in the molding department at 7:00 a.m., so he waited several minutes for Plaintiff to arrive before going upstairs to see if Plaintiff was in the training room, but Plaintiff was not there either. (DSOMF ¶ 41.)[15] When Mr. Szatkowski came back down to the molding department, he saw Plaintiff walk

---

[13] Plaintiff does not support his denial with evidentiary citations and so it is not considered. (Pl. Am. Resp. to DSOMF ¶ 40.) Accordingly, DSOMF paragraph 40 is deemed admitted.

[14] Plaintiff's assertions that Ms. Schmidt told Plaintiff at some unspecified time to speak to Mr. Pigott about working on a flexible schedule, and that Plaintiff asked Mr. Pigott about a flexible schedule, are not supported by any of Plaintiff's evidentiary citations and so are not considered. (PSOMF ¶ 27.)

[15] Plaintiff's denial is supported only with a citation to his declaration that he was not in the training room at the time in question. (*See* Pl. Resp. Mem., Ex. B ¶ 16, ECF No. 55-3 (although Plaintiff cites to paragraph 17, this appears to be a scrivener's error).) Accordingly, DSOMF paragraph 41 is deemed admitted.

in carrying his coat and confronted Plaintiff about being late. (*Id*. ¶ 42.)[16] Plaintiff claimed to have been in the training room, but Mr. Szatkowski had just come from the training room, so he knew it was empty and Plaintiff was lying. (*Id*. ¶ 43.)[17] Around the same time, Ed Trowbridge, Defendant's "Manufacturing Engineering Manager," and Mr. Szatkowski complained to Mr. Follman that they had seen Plaintiff coming in late. (*Id*. ¶¶ 44-45.)[18] Mr. Szatkowski told Mr. Follman to have Mr. Skowronski again pull security footage showing Plaitniff's arrival times. (*Id*. ¶ 45.)

On July 19, 2019, Ms. Schmidt, Mr. Follman, and Mr. Szatkowski had another meeting with Plaintiff at which he was told that continued lateness and/or falsifying time records would result in discharge. (*Id*. ¶¶ 50-51.) Ms. Schmidt, Mr. Follman and Mr. Szatkowski represented that certain security footage showed Plaintiff arriving to work after 7:00 a.m. on June 10, 11, 12, and 19, 2019.[19] (*Id*. ¶ 46.) The molding department timesheets for those dates stated that Plaintiff started work at 7:00 a.m. (*Id*. ¶ 47.) Mr. Follman had roughly six unofficial conversations with

---

[16] Plaintiff denies this fact but cites only to his declaration that he was not in the training room at the time in question. (*See* Pl. Resp. Mem., Ex. B ¶ 16, ECF No. 55-3 (although Plaintiff cites to paragraph 17, this appears to be a scrivener's error).) Accordingly, Plaintiff's denial is not considered and DSOMF paragraph 42 is deemed admitted.

[17] Plaintiff denies this fact but cites only to his declaration that he was not in the training room at the time in question. (Pl. Am. Resp. to DSOMF ¶ 43 (citing Pl. Resp. Mem., Ex. B ¶ 16, ECF No. 55-3).) Accordingly, Plaintiff's denial is not considered and DSOMF paragraph 43 is deemed admitted.

[18] Plaintiff does not support his denial with evidentiary citations and so it is not considered. (Pl. Am. Resp. to DSOMF ¶ 44.) Accordingly, DSOMF paragraph 44 is deemed admitted.

[19] Plaintiff states that the quality of the security footage is of such poor quality that it cannot be determined it is him. (Pl. Am. Resp. to DSOMF ¶ 45.) Regardless of whether there is a disputed fact over whether the security footage in fact depicts Plaintiff, for the reasons explained below, Defendant's belief is the material issue.

Plaintiff about his timeliness. (*Id.* ¶ 53.) [20] In September or October of 2019, Mr. Follman received additional complaints from other employees that Plaintiff was showing up late and documenting incorrect starting times on his timesheet. (*Id.* ¶ 54.) [21]

Ultimately, Ms. Schmidt and Tom Roeser, Defendant's CEO, made the decision to terminate Plaintiff's employment because Plaintiff's tardiness and falsification of timesheets continued despite repeated counseling. (*Id.* ¶ 59.) [22] Defendant's stated reason for terminating Plaintiff in the October 18 termination notice was: "Violating company policy: After multiple warnings & suspension continues to come in late & falsifies time card." (DSOMF Ex. R at OTTO_000438, ECF No. 50-1.) Plaintiff's employment with Defendant ended on October 18, 2019. (*Id.* ¶ 60.)

## B. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald*

---

[20] Through his denial and supporting evidentiary citations, Plaintiff attempts to argue that the problems conveyed to him during the conversations were not true—not that the conversations never occurred. (Pl. Am. Resp. to DSOMF ¶ 53.) Accordingly, Plaintiff's denial is not considered and DSOMF paragraph 53 is deemed admitted.

[21] Plaintiff supports his denial in part by citing to paragraph 15 of his declaration, which the Court does not consider due to lack of personal knowledge. *See supra* note 8. Next, Plaintiff's denial that he was late to work does not controvert the fact that Mr. Follman received complaints from other employees. Plaintiff appears instead to be improperly attempting to argue that the bases of the complaints were not true. Finally, Plaintiff's denial of an unidentified statement by Mr. Szatkowski in his response to paragraph 54 has no apparent connection whatsoever to the fact asserted. For these reasons, paragraph 54 of DSOMF is deemed admitted.

[22] Plaintiff's denial does not respond to the fact that Ms. Schmidt and Mr. Roeser made the decision to end Plaintiff's employment, nor their stated basis for their decision, which are deemed admitted. (Pl. Am. Resp. to DSOMF ¶ 59.)

*Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In other words, failure to support any essential element of a claim renders all other facts immaterial. *Id.* at 323. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

## C. DISCUSSION

The ADA, as amended, provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees[.]" 42 U.S.C. § 12112(a). "To prove a violation of § 12112(a), a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503-04 (7th Cir. 2017) (quoting *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)) (internal punctuation omitted).

### i. Disability

Under the ADA, "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102 (1). The first prong is referred to as the "actual disability" prong; the second prong is referred to as the "record of" prong; and the third prong is referred to as the "regarded as" prong. 29 C.F.R. § Pt.

11

1630, App. The meaning of disability under the ADA is "construed in favor of broad coverage[.]" 42 U.S.C. § 12102(4)(A).

While ADD can qualify as an "impairment" for purposes of the statute, *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998), "not every impairment will constitute a disability[,]" 29 C.F.R. § 1630.2(j)(1)(ii). "[T]he existence of a medical condition alone is insufficient to satisfy the ADA." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012). Determining whether a plaintiff has a disability is made on an individualized basis. *Id*.

### a. "Actual disability" and "record of" Prongs

Plaintiff appears to rely solely upon the "record of" prong. (Am. Compl. ¶ 38, ECF No. 47.) "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i) (additionally including sitting, reaching, and interacting with others). They are "not determined by reference to whether it is of 'central importance to daily life.'" 29 C.F.R. § 1630.2(i)(2).

An impairment is a disability under the ADA if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). However, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id*. Because both the "actual disability" prong and the "record of" prong

require a determination of whether an impairment "substantially limits" a "major life activity," the Court assesses both prongs together.

The full extent of Plaintiff's argument is as follows: Plaintiff de facto has a disability within the meaning of the ADA because he was granted an accommodation by Mr. Follman in 2016 to work on a flexible schedule. Even assuming that disputed fact to be true, Plaintiff fails to specify any particular major life activity affected by his ADD now or in the past. Plaintiff only cursorily mentions that he "testified that ADD affects his entire life and he is not normal," (Pf. Resp. Mem. at 6, ECF No. 55), but his evidentiary citations do not support that assertion. The Court nonetheless found Plaintiff's referenced testimony in his deposition,[23] which states more fully as follows:

> Q.      Let me ask you this way. Does your ADD limit your life activities at all?
> A.      No. Well, anxiety, yes, a lot. I get very nervous. I can't talk to people. I'm pretty – keep to myself for the most part. So it does affect my – I don't like going into stores or where people are at. I try to do my thing, just my life. . . .
> Q.      Do either of your diagnoses, your anxiety or your ADD, affect your life activities in any other way other than what you've told me?
> A.      I think it affects your whole life. I mean, it's hard to pinpoint what areas affects it more, what less, because you are not a normal person, per se. Yes I'm not normal, but I probably am better at other things where people are not. So that would be it.

(DSOMF Ex. A at 125:20-126:1 and 126:6-13, ECF No. 50-1.)[24]

Plaintiff fails to explain, and the record does not reveal, how the generalizations that "ADD affects his entire life" and that he "is not normal" substantially limit his ability to perform any major life activity as compared to most people in the general population or did so in the past.

---

[23] "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

[24] Plaintiff makes no allegations, nor do the parties argue, that Plaintiff's anxiety is a disability under the ADA. The Court accordingly only considers Plaintiff's ADD.

It is undisputed that Plaintiff has issues with the concept of time, has trouble keeping track of time, and has trouble remembering dates. It is also undisputed that Plaintiff was often tardy to work, although the parties dispute whether Plaintiff's tardiness was because of his ADD. Even assuming these facts implicate the "major life activity" of "concentrating, thinking, [or] working[,]" 42 U.S.C. § 12102(2)(A), Plaintiff fails to explain, and the record does not reveal, if and how his ADD "substantially limits" his ability to perform those activities as compared to most people in the general population.

Plaintiff does not submit a shred of evidence that his ADD, or his difficulty with keeping track of time and remembering dates, has any effect whatsoever to "perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." 29 C.F.R. § Pt. 1630, App. At most the evidence might demonstrate a "substantial limitation in performing the unique aspects of a single specific job[,]" although even that is doubtful and, in any event, insufficient. *Id*. ("Demonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working."); *see also Nadolski v. Assocs. in Sleep Med., Inc.*, 160 F. Supp. 3d 1051, 1055-56 (N.D. Ill. 2016) (finding plaintiff's ADHD did not "substantially limit" him as compared to the general public with respect to thinking, concentration, and working).

Illustrative of the sort of evidence that might create a genuine issue of material fact as to whether a plaintiff with ADD had a history of learning-related limitations, and therefore a disability under the ADA, is *Davidson*, 133 F.3d at 510, where it was undisputed that throughout high school, college, and graduate school, plaintiff confronted impediments to her ability to learn—namely, difficulties focusing in the classroom and assimilating new material. The court

14

found that "specific" examples provided by the plaintiff, including dictating her school notes and then writing them out again by hand and writing out passages just read in a textbook, were evidence from which a factfinder could reasonably conclude that she had a history of ADD substantially limiting her ability to learn as compared to the average person in the general population. *Id.*[25] Here such evidence is conspicuously missing. *Cf. Nadolski*, 160 F. Supp. 3d at 1057. It is not hard to imagine that many people in the general population do not feel normal, lose track of time, or have trouble remembering dates. Without more, Plaintiff fails to elicit any evidence from which a factfinder could reasonably conclude that he had a history of ADD substantially limiting his ability to concentrate, think or work as compared to most people in the general population.

The two cases cited by Plaintiff do not merit a different conclusion. *See Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725 (N.D. Ill. 2014); *Atwell v. Indianapolis-Marion Cnty. Forensic Servs. Agency*, 168 F. Supp. 3d 1125 (S.D. Ind. 2016). Neither district court case is binding on this Court. Further, the court in *Isbell* analyzed whether an employer failed to accommodate a disability, where both parties agreed that the plaintiff had a disability. *Isbell*, 30 F. Supp. 3d at 733. Here, by contrast, the Court dismissed Plaintiff's failure to accommodate claim for failure to exhaust administrative remedies (Order dated July 15, 2021, ECF No. 23), and the parties dispute whether Plaintiff has a disability.

---

[25] *Davidson* was decided before the enactment of the ADA Amendments Act of 2008 ("ADAAA"), which was passed in part to lower the level of limitation necessary to obtain coverage under the ADA. 29 C.F.R. § Pt. 1630, App. (quoting ADAAA section 2(b)(5)). Prior to the ADAAA, the ADA used the term "average person in the general population," while the ADAAA changed the language to "most people in the general population." However, "[t]his revision is not a substantive change in the concept, but rather is intended to conform the language to the simpler and more straightforward terminology used in the legislative history to the [ADAAA]." 29 C.F.R. § Pt. 1630, App.

In *Atwell*, the court found there was sufficient evidence to establish a disability, namely, the opinion of the plaintiff's treating neurologist stating that the plaintiff's post-concussive syndrome was a mental impairment that substantially limited her major life activities of short-term memory, speaking, concentrating, and thinking. *Atwell*, 168 F. Supp. 3d at 1136. By contrast, Plaintiff here does not submit any opinion by his treating physician or any similar evidence.

Simply put, there is not enough evidence in the record for a jury to find that Plaintiff was disabled under the "actually disabled" or "record of" prongs.

**b. "Regarded as" Prong**

Plaintiff does not argue that he was "regarded as" disabled. For the sake of completeness, the Court nonetheless undertakes that analysis. "[A]n individual is 'regarded as' having a qualifying impairment if subjected to a prohibited action 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Bowers v. Dart*, 1 F.4th 513, 520 (7th Cir. 2021) (quoting 42 U.S.C. § 12102(1)(C), (3)(A)). To succeed on a claim under the "regarded as" prong, a plaintiff "must prove that (1) the decision-maker regarded him as having an impairment; and (2) she made her employment decision on the basis of that perception." *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 707 (7th Cir. 2015). "[A] person must show, for both coverage under the 'regarded as' prong and for ultimate liability, that he or she was subjected to a prohibited action *because of* an actual or perceived impairment [and] this showing need only be made once." 29 C.F.R. § Pt. 1630, App. (emphasis added).

It is undisputed that Plaintiff's employment with Defendant was suspended on March 7, 2019, and then terminated on October 18, 2019. The record is not clear about who the relevant

16

decision-maker was respecting the suspension—Mr. Pigott, Ms. Schmidt, Mr. Szatkowski, and Mr. Follman attended the meeting, and Ms. Schmidt handed Plaintiff a write-up prepared prior to the meeting. It is undisputed that Mr. Pigott, Ms. Schmidt, and Mr. Szatkowski did not know about Plaintiff's ADD prior to the meeting and so Plaintiff cannot establish that they regarded Plaintiff as an individual with an impairment. *Silk*, 795 F.3d at 709. There is, however, conflicting evidence as to whether Mr. Follman knew of Plaintiff's ADD since 2016, and the March 7 write-up was signed by someone with the title "Molding Supervisor," which describes Mr. Follman's title. The "Company Statement" section of the write-up uses first-person: "Lou has been caught several times coming in late then falsifying his time sheet. This has been discussed With [sic] Lou several times with me & Len Szatkowski." (DSOMF Ex. N at OTTO_0004118, ECF No. 50-1.) However, the record is silent as to whether Mr. Follman in fact wrote the write-up and whether the signature on the document is his. There is thus a genuine issue of material fact as to whether Mr. Follman was a decision-maker in Plaintiff's suspension. If the factfinder determines that Mr. Follman was such a decision-maker, there is further a genuine issue of material fact as to whether he suspended Plaintiff "because of" Plaintiff's ADD for the reasons set forth in the "Causation" section below.

Next, it is undisputed that the termination decision was made by Ms. Schmidt and Mr. Roeser.[26] There is no evidence in the record that Mr. Roeser knew of Plaintiff's ADD and so Plaintiff cannot establish that he regarded Plaintiff as an individual with an impairment. *Silk*, 795

---

[26] While Plaintiff makes no argument in this vein, the Court notes that the evidence that other management personnel were involved in the various meetings with Plaintiff leading up to his ultimate termination is not, without more, enough to deem them relevant decision-makers for Plaintiff's termination. *Seye v. Trustees of Indiana Univ.*, 830 F. App'x 778, 780 (7th Cir. 2020) (finding no evidence that dean did more than make a recommendation to chancellor to deny plaintiff's tenure and so chancellor remained the relevant decision-maker).

F.3d at 709. There is, however, a dispute over whether Ms. Schmidt learned of Plaintiff's ADD at the March 7, 2019, meeting. And for the reasons described in the "Causation" section below, there is a genuine dispute of material fact as to whether Plaintiff's ADD was the basis of the termination decision.

In sum, there are genuine issues of material fact precluding summary judgment as to whether Plaintiff had a disability under the ADA "regarded as" prong.

### ii.  Causation

There are additionally genuine issues of material fact that preclude summary judgment as to whether Plaintiff was suspended and then terminated on the basis of his ADD. In order to "survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action[.]" *Monroe*, 871 F.3d at 504 (quoting *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)) (punctuation omitted).[27] In a but-for analysis, a defendant may have had other motivations for its adverse action, but if the employer would not have taken the action if not for the disability, the disability is the but-for reason for the action. *Serwatka*, 591 F.3d at 962.[28]

To make this showing, "a plaintiff can use either direct or circumstantial evidence." *Monroe*, 871 F.3d at 504. "Direct evidence would be an admission that the defendant fired the

---

[27] While one of the amendments to the ADA under the ADAAA was to change the language prohibiting employers from discriminating "because of" a disability to prohibiting employers from discriminating "on the basis of" a disability, "it is an open question whether the change from 'because of' to 'on the basis of' changes the 'but for' causation standard." *Monroe*, 871 F.3d at 504 (citation omitted). Like the parties in *Monroe*, the parties in this case have not argued that another causation standard should apply, so this Court continues to apply the "but for" causation standard. *Id.*

[28] *Serwatka* was decided based on the pre-2008 ADA "because of" language. *See supra* n. 27. The court in *Serwatka* acknowledged the new language but declined to rule on whether it would have any effect on the but-for analysis.

plaintiff on the basis of his disability. Circumstantial evidence may include (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. (quoting *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014)). While the Seventh Circuit previously referred to two different methods of proof—the "direct method" and the "indirect method"—it has since "move[d] away from the many multifactored tests in employment discrimination cases and [asks], when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge[.]'" *Id*. (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Plaintiff appears to proceed under the *Ortiz* method of considering the evidence as a whole. He offers only circumstantial evidence that disability discrimination was the "but for" reason for his suspension and termination, specifically: 1) his own testimony and declaration that similarly situated employees outside of the protected group received better treatment; and 2) his own testimony and declaration that Defendant's stated reasons for suspension and termination are pretextual. The Court addresses each argument in turn.

### a. Comparators

Plaintiff identified two employees with unknown disability status, Chaney Duron and Bill Ferguson, and one employee with dyslexia, Jose Martinez, who Plaintiff contends engaged in misconduct similar to his and were not terminated. "'In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is directly comparable to her or him in all material respects'" as well as outside a protected group. *Monroe*, 871 F.3d at 507

(quoting *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)) (internal punctuation omitted). Generally, a plaintiff must show that his comparators "'dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Here, there is very little evidence in the record regarding Plaintiff's purported comparators. Even assuming the three other employees dealt with the same supervisor, were subject to the same standards, and were at least sometimes tardy for their shifts, there is simply no evidence that they falsified their timesheets or lied to management about arriving tardy. These materially differentiating circumstances distinguish their conduct, as well as Defendant's treatment of them, from Plaintiff's. Importantly, it is unknown whether Mr. Duron and Mr. Ferguson have disabilities and therefore are outside Plaintiff's protected group. There is very little evidence about Mr. Martinez's dyslexia other than the fact that he told Plaintiff he has it. There is thus insufficient evidence to create a question of fact as to whether similarly situated employees outside of Plaintiff's protected group systematically receive better treatment than Plaintiff. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (no issue of fact where plaintiff did "not provide any information that would allow a finder of fact to determine that these individuals are indeed similarly situated").

**b. Pretext**

There are genuine disputes of fact as to whether Defendant's stated reasons for suspension and discharge are pretextual. "'In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to

explain the discharge.'" *Monroe*, 871 F.3d at 505 (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)). "'Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Id.* (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)).

Defendant's stated reason for suspending Plaintiff in the March 7 write-up was: "Lou has been caught several times coming in late then falsifying his time sheet. This has been discussed With [sic] Lou several times with me & Len Szatkowski." (DSOMF Ex. N at OTTO_0004118, ECF No. 50-1.) Defendant's stated reason for terminating Plaintiff in the October 18 termination notice similarly was: "Violating company policy: After multiple warnings & suspension continues to come in late & falsifies time card." (DSOMF Ex. R at OTTO_000438, ECF No. 50-1.) The Court considers each in turn.

### 1. Suspension

The undisputed evidence shows that prior to March 7, 2019, Plaintiff often arrived at work after 7:00 a.m. and falsified his timesheets by writing that he started work at 7:00 a.m. Defendant plainly has a partial legitimate, non-discriminatory basis for suspending Plaintiff on March 7: falsification of timesheets. *See, e.g.*, *Jackson v. Am. Airlines, Inc.*, No. 06-CV-213, 2008 WL 4211121, at *8 (N.D. Ill. Sept. 10, 2008) (falsification of payroll forms to get paid for time not worked was legitimate, non-discriminatory reason for discharge).[29]

Any argument that Plaintiff's ADD caused him to be tardy, which in turn caused him to falsify his timesheets, would be too attenuated. The Seventh Circuit in *Monroe* found that "even

---

[29] While the parties do not raise the issue of whether Plaintiff's three-day suspension is an adverse employment action, "all unpaid suspensions—regardless of the length—could constitute adverse employment actions." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 914 (7th Cir. 2022).

if decision makers believed [plaintiff] had PTSD, and that his PTSD caused him to not be able to sleep and to be volatile toward his subordinates, this still would not establish pretext." *Monroe*, 871 F.3d at 506. "'[A]n employer may, consistent with the ADA . . . , terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability[.]'" *Id*. (quoting *Felix v. Wisconsin Dep't. of Transp.*, 828 F.3d 560, 574 (7th Cir. 2016)). The fact that the parties dispute whether Plaintiff had an accommodation of a flexible schedule is immaterial to this conclusion, as there is no contention that Plaintiff's accommodation extended to Plaintiff's decision to falsify his timesheets.

The inquiry does not end there, however. [30] Defendant's March 7 write-up, as well as its argument in its briefing, indicates that Plaintiff's violation of its attendance policy was also a basis for Plaintiff's suspension. [31] There are issues of fact as to whether: Mr. Follman was a decision-maker in Plaintiff's suspension; Plaintiff told Mr. Follman in 2016 that he had ADD, and that he consequently had trouble keeping track of time and needed help; Mr. Follman granted Plaintiff a flexible schedule at that time; and Plaintiff's ADD in fact caused his tardiness. If true, then Mr. Follman's decision to suspend Plaintiff on the basis of tardiness could be suspect. The fact that Mr. Follman has a son with ADD is not dispositive on summary judgment—indeed, a reasonable factfinder could find that this evidence cuts either way. Summary judgment is therefore not appropriate in this respect.

---

[30] While the Seventh Circuit has held that the ADA does not permit "mixed-motive" claims, it more recently indicated otherwise. *Compare Serwatka*, 591 F.3d at 964 ("[M]ixed-motive claims . . . do not entitle a plaintiff to relief for disability discrimination."), *with Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) ("The ADA permits mixed-motive claims.").

[31] Defendant argues that an additional rationale for suspending Plaintiff was his failure to call Mr. Follman or management when Plaintiff was going to be tardy as required by Defendant's policy, but there is no evidence that this was a basis for suspension at the time of the decision.

## 2.  Employment Termination

Summary judgment is likewise not appropriate on Plaintiff's discriminatory termination claim. The evidence shows, however, that there is no issue of fact that Ms. Schmidt and Mr. Roeser honestly believed that Plaintiff continued to arrive tardy and to falsify his timesheets after March 7, 2019, and there is no evidence of discriminatory animus by them. Specifically, it is undisputed that: Plaintiff understood that after the March 7 meeting he was required to check in with management at 7:00 a.m.; Plaintiff continued to arrive to work after 7:00 a.m. but not check in with management; Ms. Schmidt, Mr. Follman and Mr. Szatkowski represented that that security footage showed Plaintiff arrived to work after 7:00 a.m. on June 10, 11, 12, and 19, 2019, while the timesheets for those dates stated that Plaintiff started work at 7:00 a.m.; Plaintiff lied to Mr. Szatkowski about his whereabouts on one occasion; Plaintiff's coworkers and supervisors continually complained about Plaintiff's tardiness and falsification of timesheets; on six occasions Mr. Follman counseled Plaintiff for tardiness; tardiness, falsification of timesheets and time theft are against Defendant's policy; falsification of timesheets may be cause for dismissal; and Ms. Schmidt and Mr. Roeser made the decision to end Plaintiff's employment on the stated basis of continued tardiness and falsification of timesheets despite repeated warnings.

There is no evidence nor contention that Mr. Roeser knew of Plaintiff's ADD at the time he made the termination decision. The parties dispute whether Plaintiff told Ms. Schmidt of his ADD at the March 7 meeting, and whether she told him about a special clock that would help him keep track of time. However, even assuming those disputed facts to be true, "[a]n employer's knowledge of, and conscientious responses to, an employee's disability are not evidence of discrimination." *McCann v. Badger Mining Corp.*, 965 F.3d 578, 595 (7th Cir. 2020). Plaintiff has "not presented any evidence to undermine the fact that [Mr. Roeser and Ms.

23

Schmidt] believed" that Plaintiff continued to arrive tardy and to falsify his timesheets after March 7, 2019, and that doing so justified termination. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 854 (7th Cir. 2015); *see also Silk*, 795 F.3d at 708 (finding the decision-maker's belief that plaintiff was a poor instructor "constituted a legitimate, non-discriminatory reason for terminating [plaintiff's] employment" and that the plaintiff failed to put forward evidence to suggest that the decision-maker "did not *honestly believe*" that reason (emphasis original)).

There is one final consideration the Court must make, however, even though it was not raised by the parties: whether the "cat's paw" theory of liability applies. Under that theory, "the ultimate decisionmaker issued an adverse employment action based on the discriminatory animus of another." *McDaniel*, 940 F.3d at 370 (citation omitted); *see also Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) ("In employment discrimination cases, the 'cat's paw' is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias."). Here, Plaintiff would have to show that Mr. Follman "'actually harbored discriminatory animus'" against Plaintiff (a disputed fact for the reasons identified above), and that Mr. Follman's "'input was a proximate cause' of the adverse actions against him." *McDaniel*, 940 F.3d at 370 (quoting *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017)). To avoid liability, "a decisionmaker 'is not required to be a paragon of independence. It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision.'" *Id.* (quoting *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).

Here, Plaintiff offers his own testimony and declaration as evidence that Mr. Follman, not Plaintiff, filled out the timesheets after March 7, 2019, which Mr. Follman denies. Even if assumed true, there is no evidence that either Ms. Schmidt or Mr. Roeser knew Plaintiff was not

24

filling out his own timesheets as he had before, or that Plaintiff claimed as much. But Ms. Schmidt and Mr. Roeser indisputably based their termination decision in part on timesheets that a factfinder could determine were fabricated by Mr. Follman. The October 18 termination notice itself attaches one of those timesheets, and coworker complaints were based in part on the falsification of those timesheets (in addition to tardiness). Mr. Follman was present at the July 19 meeting at which Plaintiff was told that continued lateness and/or falsifying time records would result in discharge. The investigation that led to the July 19 meeting involved Mr. Follman (at Mr. Szatkowski's request) having Mr. Skowronski pull security footage showing Plaintiff arriving to work after 7:00 a.m. on June 10, 11, 12, and 19, 2019, and comparing timesheets for those dates stating that Plaintiff started work at 7:00 a.m.

However tenuous, there are genuine disputes of fact for the jury as to whether Mr. Follman "actually harbored discriminatory animus" against Plaintiff and whether Mr. Follman's "input was a proximate cause of the adverse actions against him." *Cf. id.* (finding no evidence to support cat's paw theory where, among other things, plaintiff did not allege that anything in materials relied upon as basis for suspension was false); *Grant*, 870 F.3d at 570-71 (plaintiff may have been able to show pretext under cat's paw theory if there were evidence that the report that formed the basis of decision-maker's honest belief was inaccurate).

There are thus questions of fact as to whether Defendant terminated Plaintiff's employment on the basis of his ADD that preclude summary judgment in this respect.

### iii. Qualified to Perform Essential Functions

Finally, there are questions of fact on whether Plaintiff was "['] otherwise qualified to perform the essential functions of the job with or without reasonable accommodation.[']" *Monroe*, 871 F.3d at 503 (quoting *Roberts*, 817 F.3d at 565)). "The term essential functions

means the fundamental job duties of the employment position the individual with a disability holds or desires" but it "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "'[T]he inquiry will then center around whether removing the function would fundamentally alter that position.'" *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019), *as amended* (Aug. 9, 2019) (quoting 29 C.F.R. § 1630.2, App.). Courts should "'[']look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position[,]'" *id.* (quoting *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005)), as well as "'[t]he consequences of not requiring the incumbent to perform the function.'" *Id.* (quoting *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 192 (7th Cir. 2011)). "[A]lthough the employer's judgment is an important factor, it is not controlling" and "[t]he ADA does not give employers unfettered discretion to decide what is reasonable." *Miller*, 643 F.3d at 198-99. "'The essential-function inquiry is a factual question, *not* a question of law.'" *Bilinsky*, 928 F.3d at 570 (quoting *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016)) (emphasis original).

In this case, the Court considers whether timeliness was an essential function of Plaintiff's molding technician position. It is undisputed that employee punctuality is important to Defendant because the departments plan their days by the number of staff they have, and if a molding press is not active, the company cannot produce as much product. Defendant offers unrebutted testimony that Plaintiff's tardiness was interfering with the molding department's production because he was not present to go over what had transpired during the evening shift and what needed to be produced for the day. Indeed, "reliable attendance" was listed as a job specification for the molding technician job description. (DSOMF ¶ 8.)

26

Yet it is also undisputed that Plaintiff worked as a molding technician for nearly twenty years and often arrived tardy to work between 2016 and 2019. Plaintiff received ratings of "exceptional" or "competent" on his annual performance reviews between 2013 and 2017 with no mention of tardiness. (Pf. Resp. Mem. Ex. C at OTTO_000027-28, ECF No. 55-3.) It was not until 2019 that Plaintiff began to encounter problems, when he began to accumulate points as part of Defendant's progressive discipline system. There were no changes to his duties due to intervening events apparent in the evidentiary record. *Miller*, 643 F.3d at 200.

The parties do dispute, however, whether Plaintiff had an accommodation from Mr. Follman to work on a flexible schedule before March 7, 2019, provided Plaintiff worked eight hours during his shift. For this reason, *Taylor-Novotny v. Health Alliance Medical Plans, Inc.* is distinguishable. 772 F.3d 478, 490 (7th Cir. 2014) (finding plaintiff had not identified any evidence in the record that there was an accommodation that would allow her to meet the requirement that employees working in the office or at home be accessible at regular times to supervisors, staff, and customers).[32]

The parties also dispute whether Mr. Pigott told Plaintiff at a company picnic that he did not care if "you guys" were five or ten minutes late, (PSOMF ¶ 27), and whether other employees in the molding department were permitted flexible schedules at various times. While the undisputed evidence shows that Plaintiff did not always call in to management when he knew he was going to be late as other employees did, this fact is not dispositive on summary judgment.

---

[32] The other Seventh Circuit cases cited by Defendant are also distinguishable because, among other things, they involve employees with excessive absenteeism. *See Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (dispatcher with no diagnosis was absent for two weeks after being only briefly employed); *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 946 (7th Cir. 2001) (dockworker called in sick 37 out of 113 work days in 1991, 12 out of 171 work days in 1992, 126 out of 242 work days in 1993, 47 out of 227 work days in 1994, 50 out of 181 work days in 1995, and every work day in January through March of 1996).

Rather, the factfinder should be permitted to consider the evidence and decide whether timeliness was an essential function of Plaintiff's molding technician position.

### iv. Damages

Defendant argues that summary judgment should be granted on Plaintiff's claims for severance pay and "health insurance" damages.[33] Plaintiff argues that deciding damages at this stage would be premature, citing no authority in support.

First, Defendant argues an employer is not required to award severance pay under Illinois law unless the obligation arises from an employment contract. *Cobb-Alvarez v. Union Pac. Corp.*, 962 F. Supp. 1049, 1053 (N.D. Ill. 1997). It is undisputed that Plaintiff was an at-will employee and never had a written employment agreement with Defendant. (DSOMF ¶ 76.)

Plaintiff bases his claim for severance pay upon a letter written by his attorney on July 9, 2020, to Mr. Roeser disputing his dismissal. (DSOMF Ex. T ¶ 4.) Plaintiff claims $17,316 in severance pay, purportedly calculated by multiplying his hourly rate in February 2019 of $24.50 per hour by 40 hours per week. (*Id.*) Plaintiff does not explain further how he reached the figure $17,316. (*Id.*) Regardless, Plaintiff fails to show that he is entitled to severance pay in the absence of such an agreement with Defendant. Summary judgment is granted for Defendants in this limited regard.

Second, Defendant argues that Plaintiff fails to provide any evidence to support his claim for health insurance damages. Rule 26 requires disclosure of "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and

---

[33] Defendant also argues that Plaintiff is not entitled to emotional distress damages, but Plaintiff verified that he is not seeking such damages. (DSOMF Ex. T ¶ 23.) Additionally, Defendant makes no argument respecting Plaintiff's claims for back pay, which remain at issue in this case. (*Id.* ¶ 4.)

copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(iii). Failure to do so means "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Further, the party seeking to recover must prove "damages to a reasonable degree of certainty[, and] . . . [d]amages may not be awarded on the basis of conjecture or speculation." *Telemark Dev. Grp., Inc. v. Mengelt*, 313 F.3d 972, 983 (7th Cir. 2002) (citations omitted). "[A] nonmovant's failure to produce sufficient evidence of the damages element of its claim calls for the entry of summary judgment against that party." *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 767 (N.D. Ill. 2005) (collecting cases).

Plaintiff's interrogatory responses state that "the figure for health insurance compensation is yet to be calculated" and "records for my health insurance are incomplete and this question will be updated when the information becomes available, which should be the week of October 17, 2021." (DSOMF ¶ 77; *id.* Ex. T ¶ 4.) Plaintiff admits that he testified he has documents relating to his health insurance damages, though none were produced in this litigation. (DSOMF ¶ 78.) Plaintiff further admits that he testified he does not know how much Defendant paid for his health insurance while he was employed, and he does not know how much he paid for his employee portion of his health insurance premiums. (*Id.*) Finally, Plaintiff admitted that he testified contradictorily about whether he has had any health insurance since he was let go from Defendant. (*Id.* ¶ 79.) At summary judgment, Plaintiff does not attempt to offer any evidence of

health insurance damages or explain why his failure to disclose or produce was substantially justified or is harmless.

Plaintiff fails to provide sufficient evidence of "health insurance" damages to a reasonable degree of certainty. Consequently, summary judgment is also granted for Defendant in this limited respect.

## III.    CONCLUSION

Because there remain questions of material fact as to Plaintiff's discriminatory suspension and termination claims that preclude summary judgment, Defendant's motion for summary judgment [49] is denied in part. Summary judgment is granted in part in Defendant's favor with respect only to Plaintiff's claim for severance pay and health insurance damages. Defendant's motion to strike [60] is denied.

**SO ORDERED.**                                         **ENTERED: March 28, 2023**


_____
**HON. JORGE ALONSO**
**United States District Judge**